## McCARTY v. KEPRETA.

(— L.R.A.(N.S.) —, 139 N. W. 992.)

This action for replevin is brought by plaintiff as indorsee of a note secured

---

Note.—On the question of imputation of knowledge of bank officers to bank, where officers are personally interested, see note in 29 L.R.A.(N.S.) 558.

by chattel mortgage on the replevied property, by which action plaintiff seeks. to recover the mortgaged property for foreclosure purposes. The note and mortgage were executed by defendant to a state bank at Knox, and by it were assigned by its cashier for value to its president, this plaintiff. Plaintiff testifies he had no actual knowledge of any infirmity in the note or of any defense to its payment; and that he, though president and a director of the bank, was a nonresident, and not active in its management, and had no personal knowledge concerning the transaction under which the note and mortgage were taken to the bank by the cashier as its managing officer. Plaintiff purchased the note of the bank before maturity, paying therefor full face value. Defendant defends on the ground that he received no consideration whatever for the note from the payee or any other person. From the trial court's rulings, that such defense is not available until actual knowledge of such want of consideration for the note shall have been established as known to this plaintiff, or until such facts were established as would constitute bad faith in the purchase of the instrument by plaintiff, and that proof that plaintiff was at all times in question the president and necessarily a director of the bank was insufficient as a foundation to admit proof of the want of consideration for the note in this action, it is *held:*

### Negotiable instruments act — banks — holder in due course.

(1) The negotiable instruments act does not operate to constitute plaintiff a holder in due course of such negotiable note, where from his relationship to the payee, the bank, under the banking laws plaintiff is presumed in law, from such relationship, to have had actual knowledge of the facts under which the note was executed by defendant and obtained by the bank.

### Holder in due course — payee — indorsee — negotiable instruments.

(2) In determining whether plaintiff is a holder in due course of such negotiable instrument, as a holder in due course is defined under the negotiable instruments act, § 6354, Rev. Codes 1905, the relationship of the indorsee to the payee and the law thereto applying must be considered with, and as supplementing, the negotiable instruments act; and §§ 6354, 6357, and 6358, defining a holder in due course, defective title to the instrument, and notice of infirmity in the instrument or notice of defect of title thereto, cannot be construed as excluding the general law governing the relationship of the bank and its president, so as to constitute the president of a state bank, and necessarily by law a director thereof, a holder in due course of a negotiable instrument, against the payment of which the maker in a suit by the bank would have a defense.

### Defense — want of consideration — notice — good faith.

(3) A defense of want of consideration available to a maker as against a state bank as payee of a negotiable instrument may be asserted as a defense in an action brought by the bank president against the maker, without proof of actual notice had by such president of the fact that the note was given

without consideration; and this without regard to the good faith of the bank president in his purchase of the negotiable instrument sued upon.

**Bank — cashier's knowledge of infirmity in note — knowledge of directors — bank president.**

(4) The cashier's actual knowledge of the infirmity in the instrument, of it being without consideration, the law conclusively presumes to have been communicated in due course to, and to have been had by, the board of directors under the circumstances of this case wherein no interest hostile to the bank or in fraud of its stockholders or depositors is asserted; and such presumed actual knowledge in its directors is presumed to have been had by plaintiff as president of the bank at the time he purchased the negotiable instrument of the bank acting by its cashier.

**Presumption of law.**

(5) Whatever knowledge plaintiff as a director and officer of the bank at such time had, or ought to have possessed as an official, he will be conclusively presumed in law to have had as a private individual.

**Negotiable instrument — holder in due course — defense.**

(6) Such presumption renders impossible plaintiff's recovery as a holder in due course of the negotiable instrument in suit if the defense offered is established.

**Proof of neglect — banks — president — stockholders.**

(7) Proof of neglect of duty owing by the president to the bank, its stockholders, and depositors, and persons dealing therewith, by proof of failure of the president and director to participate in the active management of the bank, and the consequent ignorance of the facts of the transaction in question, does not relieve such official from the knowledge presumed in him, and is immaterial on the question of his good faith in the purchase of the negotiable instrument sued upon.

**Claim and delivery — counterclaim — subject-matter of action — verdict.**

(8) A defendant in an action of claim and delivery may counterclaim, and, on proof, recover for damages occasioned by the wrongful taking and detention by the plaintiff of the personal property, taken by claim and delivery proceedings pending the action, where the defendant, on the merits, recovers judgment entitling him to such property. In such an action the property replevied is the subject-matter of the action, and damages for such wrongful taking and detention of the subject-matter of the action are "connected with the subject of the action," within the meaning of the first subdivision of § 6860, Rev. Codes 1905, and as also contemplated by § 7036, Rev. Codes 1905, concerning the form of verdict to be returned in claim and delivery proceedings.

**Appeal — motion to remand record — judicial admissions — affidavits — procedure — merits.**

(9) Pending appeal, and with the record in this court, attorney for appel-

lant, in an endeavor to secure a remand of the record to the district court, that he might there move for a new trial on the grounds of newly discovered evidence tending to substantiate his defense, plead and sought to be interposed on trial, filed in this court in support of the motion to remand the affidavits of defendant, his attorney of record, and that of a third party, the latter containing statements antagonistic and contrary to both the claim of good-faith purchase in due course by plaintiff of the note, and also the defense of the defendant of a want of consideration, and tending to establish a payment by the bank of $1,500 or $1,800 to defendant as a consideration for the note, an amount in excess of the value of the property involved in these replevin proceedings, and which if taken as a judicial admission by defendant would destroy his defense of total want of consideration. Upon hearing, the motion, to remand the record was denied. Subsequently the appeal was argued and submitted for decision on the merits. Thereafter this court, on its own motion, without any consideration of the merits involved, summarily dismissed the appeal and affirmed the judgment appealed from, on the grounds that the affidavit of such third party constituted plaintiff's judicial admission of want of merit in his defense, and established the matters submitted on the appeal to be sham and frivolous. On a rehearing then granted, at which full reargument was had, it is *held*:

(a) That this affidavit, taken with all the affidavits filed for such purpose, should not be held to constitute the judicial admission of the defendant of an absence of merit in his appeal.

(b) In determining the effect to be given to an affidavit so filed by a party, its contents should be taken in connection with the other affidavits and the nature of the proceedings and purposes for which the same was filed; and when filed as here, after judgment and pending an appeal, to work a dismissal of the appeal, there should be no doubt of the intent of the party filing the same to adopt the statements therein made as his own for all purposes of the case; and the statements thus adopted must not be susceptible of an explanation consistent with good faith in the appellant.

(c) In case of a substantial doubt as to whether such an affidavit should be construed as a judicial admission of want of merit, where an explanation as to the circumstances of its filing warranted the exercise of discretion by the court, such affidavit should be held not to amount to such a judicial admission, as the holding of the court should be toward relieving a party from the inadvertent or unintentional admissions of counsel where the same, if applied, become a judicial admission, and, as a matter of procedure regardless of merit, abrogate the appeal.

(d) With the explanation made of the circumstances under which the affidavit in question was obtained for the purposes for which it was filed, it having been ruled upon and superseded by subsequent proceedings had in the case, this court will disregard such affidavit and decide the cause upon the merits.

Opinion filed January 29, 1913.

An appeal from the District Court for Benson County; *Cowan,* J. From a judgment for plaintiff, defendant appeals.

Reversed and new trial ordered.

*P. J. McClory* and *Stuart & Comstock,* for appellant.

Counterclaim for damages for wrongful taking and detention of property in claim and delivery action, proper, as arising out of or connected with the subject of the action. Rev. Codes, Sec. 6860, Subdiv. 1; Cobbey, Replevin, 1st ed. secs. 783, also 795; Vallancey v. Hunt, 20 N. D. 579, 34 L.R.A.(N.S.) 473, 129 N. W. 455.

When it is shown that the title of a person who has negotiated the note is defective, the burden is on the holder to prove that he or some other person under whom he claims had title as a holder in due course. Rev. Codes 1905, Sec. 6361; Union Nat. Bank v. Mailloux, 27 S. D. 543, 132 N. W. 168; Hinkley v. Freick, 112 Minn. 239, 127 N. W. 940; American Nat. Bank v. Lundy, 21 N. D. 167, 129 N. W. 99; Arnd v. Aylesworth, 145 Iowa, 185, 29 L.R.A.(N.S.) 638, 123 N. W. 1000.

In an action by an alleged holder in due course on a note shown to have its origin or inception in fraud, the burden is upon the plaintiff to affimatively establish his good faith in the transaction. Iowa Nat. Bank v. Carter, 144 Iowa, 715, 123 N. W. 237.

The knowledge of an agent is the knowledge of the principal. Wade, Notice, § 672; First Nat. Bank v. Erickson, 20 Neb. 580, 31 N. W. 387; Stough v. Ponca Mill Co. 54 Neb. 500, 74 N. W. 868; Third Nat. Bank v. Marine Lumber Co. 44 Minn. 65, 46 N. W. 145; Harvester v. Miller, 72 Mich. 265, 40 N. W. 429; First Nat. Bank v. Shaw, 157 Mich. 192, 133 Am. St. Rep. 342, 121 N. W. 811.

*Buttz & Sinness,* for respondent.

Counterclaim must arise out of the contract or transactions set out in the complaint. Braithwaite v. Akin, 3 N. D. 374, 56 N. W. 133.

Good faith must be shown in purchaser. Rev. Codes, sec. 6358; First Nat. Bank v. Flath, 10 N. D. 285, 86 N. W. 867; 1 Morse, Banks & Bkg. § 75; Union Nat. Bank v. Matthews, 98 U. S. 621, 25 L. ed. 188; Fortier v. New Orleans Nat. Bank, 112 U. S. 439, 28 L. ed. 764, 5 Sup. Ct. Rep. 234.

Good faith does not require plaintiff to make inquiry as to possible defenses. Goodman v. Simonds, 20 How. 343, 15 L. ed. 934; Gray v. Boyle, 55 Wash. 578, 133 Am. St. Rep. 1042, 104 Pac. 828; Craw-

ford, Anno. Neg. Inst. Law, p. 68; Sucker State Drill Co. v. Wirtz, 17 N. D. 316, 18 L.R.A.(N.S.) 134, 115 N. W. 844.

Purchaser of note must have actual knowledge of infirmity, or knowledge of such facts as amount to bad faith. American Nat. Bank v. Lundy, 21 N. D. 167, 129 N. W. 99.

Purchaser of note may be required to state that he bought in good faith. Knowlton v. Schultz, 6 N. D. 422, 71 N. W. 550; First Nat. Bank v. Flath, 10 N. D. 281, 86 N. W. 867; Walters v. Rock, 18 N. D. 52, 115 N. W. 511; American Nat. Bank v. Lundy, 21 N. D. 167, 129 N. W. 101; Stough v. Ponca Mill Co. 54 Neb. 500, 74 N. W. 868.

Goss, J. Plaintiff brings replevin alleging a special property interest by virtue of a chattel mortgage upon personal property. The debt secured by the mortgage is evidenced by a negotiable promissory note dated November 12, 1908, executed and delivered by defendant as maker to the Farmers & Merchants State Bank of Knox, and due October 1, 1909, bearing interest at 12 per cent, and indorsed, sold, and transferred for full value before maturity to plaintiff.

Defendant for answer admits the execution and delivery of the note by defendant to the bank, "but alleges that the same was given without any consideration whatever being paid him therefor by the said bank, and that the same is wholly void." That he received no consideration from anyone for the said note, and that no consideration whatever passed therefor from the bank. And as an affirmative defense, "defendant denies that the plaintiff was an innocent purchaser of the said mortgage in due course of business or at all, and alleges the fact to be that plaintiff took the said note, knowing that the same was given without any consideration to said bank, and was wholly void. That plaintiff is an officer of said bank, to wit, president, and had knowledge of the fact that there was no consideration given for the same, and that as such officer of such bank he was bound to know the facts in regard to the execution of said note, and that plaintiff took the said note with knowledge of the defenses thereto."

"For a further and affirmative defense to said complaint" the defendant alleged his ownership of the property replevied, its wrongful taking from him by replevin at this suit of plaintiff, and "that in consequence

of said acts of this plaintiff the defendant was deprived of the use of said property for the period of four days to his damage in the sum of $30." Further, that he was to an expense of $15 to secure bondsmen to rebond and redeem said replevied property; that he was put to expense, trouble, and work amounting to four days' time in trying to regain possession thereof, which time was of the value of $15, and that he was compelled to employ attorneys to defend his possession of said property, and regained possession thereof at an expense to him of $50. The prayer for relief in the replevin action was coupled with a demand for judgment for the aggregate damages above recited in the sum of $110. The part of the answer alleging and asking for damages was treated as a counterclaim, and a demurrer thereto interposed on the grounds "that the same do not state facts sufficient to constitute a defense or counterclaim," "and that the cause of action pleaded as a counterclaim does not arise out of the transaction, or of the contract, or of the matters set forth in the complaint, nor is the same connected with the subject of the action." The trial court sustained the demurrer, and error is assigned on this appeal.

On the trial of the main action, plaintiff testified to being a resident of Minneapolis, carrying on the business of real estate and loans; that he purchased the note in question from the cashier, and that "it was indorsed to me the day I bought it, and transferred and delivered to me that day. Paid $2,000 and accrued interest to the date I bought it for the note. Did not know the note had been dishonored, if it had been. I bought it in good faith. Did not know there was anything wrong with it in any way. I never saw it till the day I bought it. I was in the bank when I bought it. I was not acquainted with Kepreta, the maker. I bought some other notes at the same time, one or two I believe. I mean when I say that I bought that note in good faith that I bought it just the same as I bought every other note that I ever bought in my life, and that everything was straight about it, the note and mortgage, and I went entirely by that and the recommendation of the cashier that the paper and security was good, and that it was a first mortgage. That was the extent of the information I got when I say I purchased it in good faith. I kept the note in my possession until I sent it out for collection in September, 1909. At the time I bought this paper from the bank I had no knowledge or notice of any kind of

24 N. D.—26.

any infirmity in the instrument, the note, or of any defect of the title of the bank to the note. I made no inquiries whatever that I know of in regard to the consideration for this note. Minckler (cashier) handed me the note and wanted me to buy it, showed me the security, and told me it was a first mortgage, and told me the man was good, and I bought it on those grounds, that is all I know; had no other transaction in regard to this." Such is the testimony of the plaintiff, upon which recovery was had by an instructed verdict on the theory that the plaintiff was a holder in due course.

In line with the answer, the defendant called plaintiff for cross-examination under the statute, and he testified that he was president of the bank in question; that the bank had been organized three years, and that he was and had been president of it at all times since its organization; that one Tuff and one Minckler were the other officers of the bank; that Minckler was cashier at the time Kepreta gave the bank this note; that he did not make any examination of the records of the bank with reference to the consideration for which the note was given. The defendant in his own behalf was called and asked the question: "State what transaction or what conversation you had with Minckler as cashier of the Farmers & Merchants State Bank of Knox at the time this note was given, and what it was given for." Counsel for plaintiff then interposed the objection that the answer sought was "incompetent, irrelevant, and immaterial, no longer an issue in this case; the evidence itself, both for the defendant and plaintiff, now showing the note to have been taken in good faith, and without any notice of any infirmity therein, or any defect in the title of the bank thereto, or any lack of consideration; and it appearing legal upon its face, and that McCarty became the holder of it before it was overdue and without any notice that it had been dishonored, if it had been, and defendant is conclusively estopped from showing anything further." Before ruling upon the objection on inquiry from the court, defendant's counsel stated, with reference to this offer of proof, that the defendant had finished his evidence with reference to showing that McCarty did not purchase this note in good faith and in due course; and that the evidence offered would be with "reference to failure of consideration or lack of consideration for the note," and that otherwise the case so far as the defense was concerned was complete. The court then ruled

upon the objection, and stated that he would allow any further evidence tending to show that "McCarty had knowledge of such facts relative to this note, that his action in taking the instrument amounted to bad faith, and then after having made a sufficient showing on that to satisfy the court that the showing of failure of consideration for the note would be available to the defendant as a defense, then I will allow the evidence as to failure of consideration; but I do not believe that time has arrived in this case when the defense of failure of consideration would be available to you." Counsel for the defendant then made an offer of proof "that at the time this note was given it was given without consideration." Which offer was excluded on the ground that the evidence "shows conclusively that McCarty took the note under such conditions that he is a bona fide holder, and that it is not subject to any defense in his hands." An offer to show the amount of the capital stock of the bank, and that the note evidenced a loan in excess of 15 per cent thereof, and therefore was a loan taken by the bank, contrary to or in disregard of the provisions of the banking law, on the grounds that such excess loan "would be an element to put plaintiff on inquiry, or a circumstance admissible, he being the president of the bank at the time," was excluded on the ground that "it was not a defense to payment of the note, and that the state and its banking department were the only persons who could object to the bank exceeding its lawful limit of loan to any one person." Further offers of proof along the same lines were excluded on similar ground. Error was saved and is assigned as to these adverse rulings, defendant appealing from the judgment entered on the instructed verdict.

The main case resolves into the determination of a single proposition of law. Plaintiff, while president of a state bank, and by virtue thereof one of the directors of said corporation, bought from his bank this note before its maturity, paying full value for it to the bank, who indorsed it by its cashier to the president as his individual property. Plaintiff knew of no infirmity in the negotiable instrument he thus in good faith purchased. Under the answer and issues joined and the offers of proof on trial thereunder, the maker, the defendant and appellant, received no consideration for the note from the bank or any other person. An offer to prove such want of consideration was on objection excluded on the ground that plaintiff as a holder in due course of such negotiable

paper, indorsed before maturity to him for value, was protected from such defense of want of consideration as between the maker and the payee, the court evidently applying to the case the bar announced by §§ 6357–6359, Rev. Codes 1905. If plaintiff is a holder in due course, as defined by § 6354, Rev. Codes 1905, of the negotiable instruments act of 1899, beyond doubt the trial court was correct. The decisive question, then, is whether plaintiff, by his purchase without actual notice of infirmity of the instrument, but under his relationship to the payee in the note, can be a holder in due course under our negotiable instruments law, § 6354.

A holder in due course is by this section defined to be "a holder who has taken the instrument under the following conditions: (1) That it is complete and regular upon its face. (2) That he became the holder of it before it was overdue and without notice that it had been previously dishonored, if such was the fact. (3) That he took it in good faith and for value. (4) That, at the time it was negotiated to him, he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it." As to the first three of these subdivisions, granting the purchase for value and in good faith, no question arises. It is on the fourth subdivision, as to notice to the bank who negotiated it to him, of the infirmity of the instrument, construed with § 6358, defining notice of infirmity, that the questions for solution arise. Section 6358 defines notice of infirmity in negotiable instruments necessary to defeat recovery and render a purchaser not a holder in due course, by the following provision: "To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith." Is it necessary that this director and president of the defrauding institution shall have had "actual knowledge of the infirmity, or knowledge of such facts that his action in taking the instrument amounted to bad faith," or otherwise be held to be a holder in due course, and as such be entitled to recover when the bank could not? Does plaintiff's relationship to the bank, as a director and president of it, charge him with presumed notice of the fraudulent character of the paper he claims to hold as a holder in good faith, so as to defeat such

claim and his recovery; or on the contrary, does § 6358, defining notice of infirmity and therein requiring actual knowledge of the infirmity to defeat recovery, exclude all cases of imputed or presumed notice, and declare the only rule governing in all transactions and under all circumstances, regardless of relationships of the parties, and permit plaintiff to buy, in good faith, fraudulent paper of the bank of which he is president and director, and yet stand in a court in identically the same position, with the same burden of proof resting upon the maker after such facts established as before, and the same in all respects as though an undisputed stranger to the bank, and actual good-faith purchaser for value and holder in due course, had purchased the paper, instead of this plaintiff? This latter is plaintiff's claim on the strength of which he recovered judgment below as a holder in due course on the negotiable instrument in question.

Our negotiable instruments act unquestionably declares the law on all matters covered by it and in all instances wherein it applies. It was enacted as a part of a nation-wide movement to secure uniformity of law concerning negotiable instruments and liabilities arising therefrom. About thirty of the states have an act identical with our negotiable instruments act, codifying the law merchant in such states. But the act necessarily must be construed with statutory provisions or general laws regulating the relationship of the parties. See Schlesinger v. Lehmaier, 191 N. Y. 69, 16 L.R.A.(N.S.) 626, 123 Am. St. Rep. 591, 83 N. E. 657, where the sections here under consideration were held to be applied, subject to the state banking law, and to be construed therewith where that applies; also Crawford, Anno. Neg. Inst. Law, § 72. And here the law governing notice imputed or presumed as between the payee and the president and director of this bank as indorsee of its paper must be considered with the statute as to negotiable instruments. The statute defines negotiable instruments, and also defines the rights of this holder governed by the negotiable instruments act, unless the law governing relations of bank and bank president prevent plaintiff from being a holder in due course under the act.

Under our law regulating state banking institutions, § 4639, Rev. Codes 1905, the president must be chosen from among the bank directors, who in turn must be stockholders, and as such financially interested in the income and welfare of the institution. The board of directors

under our banking laws constitutes the governing body of the bank, and the president and cashier its active, ostensible managing agents in the conduct of its business. It is in evidence that the cashier as a managing officer of the bank took to it as payee this note. Under the offer of proof rejected, we must assume it was so taken without consideration, and voidable as between the maker and payee. The bank, then, was charged with notice of all defenses and of the invalidity of the note. This is not a case illustrated by holdings similar to State Sav. Bank v. Montgomery, 126 Mich. 327, 85 N. W. 879, wherein the bank, as payee, disclaims any want of knowledge of or responsibility for the act of its managing officer in taking this note to it without paying a consideration. Why the note to the bank was obtained by the bank under such circumstances does not appear, and for aught we know it may have been executed to the bank as accommodation paper, which its president and director now assumes to hold as a holder in due course and without notice of infirmity in the instrument, and which doctrine we are asked to approve.

Section 137 of Morse on Banks & Banking answers the crucial inquiry involved. After speaking of the subject of imputed notice to the bank of matters brought to the notice of bank directors and bank officials, the authority says: "The converse of the doctrine just discussed is much more simple. Whatever knowledge a director has or ought to have officially, he has or will be conclusively presumed at law to have as a private individual." "Thus, a director is affected with notice of the condition and transactions of the bank, of its legal rights, and of the action of its directoral board on any subject. If the bank is insolvent, or if it offers him for purchase notes which could only be legally sold by authority of a directoral vote, which has never been given, he is affected with knowledge of the insolvency and of the illegality of the notes. He cannot collect upon them from the bank, on the ground of presumed regularity as a bona fide outside purchaser of them without notice and for value could do." "If a director of a bank is surety on a note, or if a director is a partner in a firm which is surety on a note, held by the bank, the surety will be affected with knowledge of the payment or nonpayment of the note without regard to any statement made by the cashier. A director is chargeable with this amount of knowledge of the affairs of the bank, whether in fact he has it or not, and cannot escape

any responsibility which such knowledge properly entails." Citing Gillet v. Phillips, 13 N. Y. 114; Merchants' Bank v. Rudolf, 5 Neb. 527; Lyman v. Bank of United States, 12 How. 225, 13 L. ed. 965; Tate v. Bates, 118 N. C. 287, 54 Am. St. Rep. 719, 24 S. E. 482; Hauser v. Tate, 85 N. C. 81, 39 Am. Rep. 689; and Proctor v. Baldwin, 82 Ind. 370.  See also United Soc. v. Underwood, 9 Bush, 609, 15 Am. Rep. 731; German Sav. Bank v. Wulfekuhler, 19 Kan. 60; Solomon v. Bates, 118 N. C. 311, 54 Am. St. Rep. 725, 24 S. E. 478; Curtis v. Leavitt, 15 N. Y. 9; Nelson v. Wellington, 5 Bosw. 178; Mason v. Jones, 1 Hayw. & H. 329, Fed. Cas. No. 9,240; Ward v. Doane, 77 Mich. 328, 43 N. W. 980; Bank of Pittsburgh v. Whitehead, 36 Am. Dec. 186, and note (10 Watts, 397).

Lyman v. Bank of United States cited, is nearly on all fours with the instant case.  Lyman and associates organized a state banking corporation (see facts fully stated in 20 Vt. 666, Fed. Cas. No. 924), and purchased a branch institution at Burlington, Vermont, of the Bank of the United States, executing notes therefor and taking over the business of the branch institution.  Lyman and one other associate had been directors of the branch bank purchased, which bank, before the purchase, had compromised and agreed to accept one-half face of certain bills receivable.  Lyman and associates, on suit for the final instalment note, undertook to counterclaim or compel the allowance to them of that portion of such claims previously discounted, claiming want of actual notice, and that therefore the branch bank had sold for face value claims it had previously compromised and reduced one half.  On the trial, in line with the contention of plaintiff in the instant case and here urged, the defendants there, quoting from the opinion, "asked the court to instruct the jury that it was a question of fact for them to find whether the defendants, or either of them, had knowledge of the condition of these debts, or whether at the time of the purchase said debts or either of them had been compromised and discharged; and if they should find that Wyllys Lyman and John Peck, or either of them, had knowledge of the condition of said debts, and that they had been compromised and discharged, or either of them, at the time of the purchase, and that they derived such knowledge while acting in their official capacity as directors or as committee of said branch bank at Burlington, that such knowledge would not affect the other defendants, or defeat or affect the

right of the defendants to have a deduction [made] from the [amount of] plaintiff's claim on account of said debts as aforesaid. . . . The court refused to instruct the jury agreeably to the . . . request of the defendants, and instructed them that it was a question whether the plaintiff sold the debt of Truesdell & Son as it stood upon the books and the same as to the debt of Silas E. Burrows [the compromised claims]; or whether defendants bought these debts with a full knowledge of the circumstances of these debts; that it appeared that, in pursuance of instructions of the parent bank to the branch bank that it was the duty of the branch bank to make semiannual returns showing what debts were good and what bad and what were considered desperate." That returns were made and memoranda entered, showing "this balance due after compromise," and " 'compromised at the New York office.' . . . That it is claimed by defendants that as those debts are put in at the original amount in the list it is a representation that the debts are due; but that the answer to this is that Lyman and Peck were directors at the Burlington branch and are to be presumed to have been cognizant of the condition of these debts; and further instructed the jury that as it appeared that Lyman and Peck knew the fact of the compromise and condition of these debts at the time of the purchase, although the defendants' objections would be well founded if notice to Lyman and Peck was not notice to the other defendants, yet notice to Lyman and Peck was, in law, notice to all the defendants, and their knowledge was to be in law imputed to the other defendants; and inasmuch as the purchasers knew at the time of the purchase that these debts had been compromised the bank was not bound to make any deduction on account of these debts." The refusal of instructions requested, and the giving of those above quoted, were excepted to, and in passing thereon the court says: "But that if these demands, or either of them, had been compromised and closed previously to the sale to the defendants by the board of directors of the branch at Burlington, inasmuch as there was no warranty of the debts, and two of the purchasers were members of the board and of course cognizant of the compromise and settlement, all the defendants, being joint purchasers, were chargeable with knowledge, and therefore there was no ground for an implied fraudulent representation on account of these two items having been inadvertently placed on the suspended list. . . . And upon a review here it is

the opinion of this court that no error was committed in the direction," and the judgment was affirmed. The directors, Lyman and Peck, of the Burlington branch bank, denied actual knowledge of the compromise, and denied imputation of knowledge to them or their associates. Their claims in such respect are identical with those of this plaintiff. That case, therefore, is the same as though this plaintiff had sued the bank as indorser on this note for which it had given no consideration and therein urged the same claims as to want of actual knowledge herein set forth. The bank could defend, notwithstanding plaintiff's claim of purchase in good faith for value without notice, for the reason that knowledge of the infirmity in the instrument and of its worthlessness was imputed to him before and at the time he purchased it. The principle announced in § 137, Morse on Banks & Banking, applies, to the effect that "whatever knowledge a director has or ought to have officially he has or will be conclusively presumed in law to have as a private individual." As a private individual he is presumed in law to know what he should know or ought to have known as an official, a bank director and bank president. And hence the impossibility of the claim by this plaintiff to be a holder in due course. To the same effect is 2 Thomp. Corp. Sec. 1662, and Lancaster v. Collins, 2 McCrary, 352, 7 Fed. 338.

In the words of Hauser v. Tate, 85 N. C. 81, 39 Am. Rep. 689, "the president of a bank is chargeable with constructive notice of the management of its affairs by the cashier and other subordinate officers."

In Gillet v. Phillips, 13 N. Y. 114, a purchase of a promissory note at a discount by a director from a bank acting through its cashier was held invalid; the court says: "Want of notice is not available as a defense to a vendee who, at the time of the purchase, was a director in the corporation whose property was the subject of the sale. By accepting that office, he assumed a duty to the stockholders and creditors of the bank to inform himself of what would appear by an inspection of the books of the institution of which he was one of the ostensible managers; and he cannot urge a want of notice arising from a neglect of duty, in justification of a transaction in his own case which the law presumes unauthorized and illegal. In this instance the transfer was made by one director in behalf of the corporation to another, and both were chargeable with knowledge that the contract which assumed to devest

the corporation of its assets was a violation of the 8th section [of the state statutes], in consequence of the omission of the board to pass the resolution necessary to give it validity."

And this leads to the inquiry bearing on the question of the legality of the sale of the note by this corporation, acting by its cashier, to its president. Under the offer of proof as between the bank payee and defendant maker, this instrument was without consideration and a fictitious purported asset upon the books under the banking laws and regulations of the banking board of this state. As director and president of the bank, as between it and its president and director, plaintiff was charged with that knowledge; and in the payment of the face of the note, with interest, to the bank, he was but performing a duty devolving upon him as a director, and discharging a liability to the bank as well, arising from the bank having such worthless paper in its assets. Under the facts if defendant's contention be true, as it must be taken to be under the offer of proof, that said note evidenced no valid consideration, that upon the order of the banking board the duty to charge off this claim, and if called upon to do so to make it good, would have devolved upon the bank and its directors and managing officers. And with notice of this contingent liability, conditional though it may have been, the bank president, this plaintiff, was charged. The law governing banking, and defining the liability of directors and managing officers in such institutions, conclusively negatives the claim that such managing officer can be, as between himself and the bank, or between himself and third persons, a holder in due course when his bank was not or could not have been such holder.

Then, again, while the note remained with the bank unnegotiated, no liability other than to cancel it as given without consideration rested upon the bank as concerned its liability to this defendant. Immediately upon its negotiation to this plaintiff, if it be assumed that such negotiation bound the bank and constituted plaintiff as a holder in due course, a new liability for the full face of the note and interest thereupon would be created by the bank to this defendant; it receiving plaintiff's money virtually as a trustee in said amount for the defendant by virtue of its own wrongful act or fraud in negotiating paper for which it had given no consideration. In this connection if fraud is to be imputed to the bank, as under such facts we believe it should be, its

president is certainly charged with notice thereof. And this is equally inconsistent with any theory that such president could be a holder in due course at the very time he is charged with notice that his act of purchase of the instrument so held consummated a fraud. If such would be the result, then the words of Bolles (Bkg. p. 370) apply, that "an officer is liable to his bank in every case of fraud and misapplication of its funds. Whatever form his misapplication may take, his bank can do nothing to whiten or legalize his act. Bank directors have often attempted to do so, but have succeeded only in implicating themselves. A fraud cannot be ratified, its parentage cannot be transferred from the offender to the bank."

Under plaintiff's contention, granting plaintiff a holder in due course, he would recover of this defendant, while as a bank official he might be personally responsible in law to defendant for his own negligence in failing to know that the bank was obtaining accommodation or fraudulent paper of defendant, and indorsing it to its president, that he might recover as a good-faith holder in due course for value. In the one case his negligence in failing to know the facts and prevent the fraud would render plaintiff personally liable, while at the same time he would be in a position to recover as a good-faith purchaser, because of his negligent failure to know the facts on which his liability for negligence arose. If we permit plaintiff as an individual to assert that he does not know what he as a bank official must in law have known, we must approve and declare possible the above inconsistent and ridiculous, but nevertheless logical, result of holding § 6358 applicable, and requiring actual knowledge of infirmity in the instrument necessary to defeat recovery by a bank president purchasing the bank's accommodation paper. For the mere purpose of uniformity in the law concerning negotiable instruments, it was never intended that its provisions requiring actual notice of the infirmity in the instrument should apply to cases such as this, to the modification or exclusion of the rules of law well established and governing the liability of directors and heads of banking corporations to the bank or its creditors.

Evidence was offered tending to show this loan, for whatever consideration given, was carried on the books of the bank for an amount that would have been in excess of 15 per cent of the capital stock of the bank. In other words, the loan was, on its face, an excess loan. With

knowledge of this fact, plaintiff was charged by law, as well as knowledge of the law rendering him as a director and president possibly financially responsible to the institution, its depositors, and creditors, defendant among the latter, until the note was cancelled or its consideration paid. Bolles, Bkg. p. 287. "Surely if they (bank directors) violate it (the law forbidding excess loans), and losses follow, it is proper to hold them responsible for the violation." And where the usury law is violated and usurious interest exacted or contracted for by the bank, knowledge thereof is imputed to its directors, who are liable therefor.

Nor is the notice imputed to plaintiff, concerning this note and the bank's relation to it if excessive, to be considered as constructive notice. Concerning the obtaining of this note, the law imposed upon the cashier the duty to inform the board of directors of the fact of want of consideration therefor. The cashier is the agent of the board and the bank, and the knowledge of the agent is presumed to have been imparted to the principal, and in the words of Bolles (Bkg. p. 392), speaking concerning this principle, the authority says: "Whenever this great rule has been applied, a bank has been regarded as having had actual knowledge of that possessed or acquired by its president or cashier concerning the pledge of its stock, the trust quality, or other peculiarity of stock pledged to the bank, the existence of a mortgage or other lien, the indorsement of notes taken by the bank, and character of the indorser, the nonpayment of an obligation held as owner or collecter, the equities between maker and indorser, the residence of an indorser, the existence of usury; of an agreement or modification thereof to which the bank is a party. . . . In many cases the presumption is conclusive; the principal is presumed to be endowed with the agent's knowledge, and is not permitted to prove the contrary. The fact may be otherwise, but the law will not permit him to set aside the presumption with evidence, however overwhelming it may be. This position is based on the soundest reasons. The rule itself which has served a great purpose might thereby be entirely destroyed. Its application to a particular case may work harshly, but if the principal did not know, the law says he ought to have known; that he alone was to blame either directly or indirectly if he did not. And therefore he, rather than the public, must suffer, as it certainly would by the destruction of the rule." The presumption that the bank president and director received the knowl-

edge possessed by the cashier as to want of consideration for the note in question is, we believe, a conclusive presumption of actual knowledge thereof presumed to have been imparted, estopping the president from claiming to be a holder in due course to the same extent as it would have operated upon the cashier individually, who, under the evidence, negotiated this loan. With actual knowledge conclusively presumed, the case is taken without the statutes defining a holder in due course, and the companion section as to actual knowledge.

In this connection there is evidence that the plaintiff, while holding the office of president, and necessarily a director of this banking institution, had left its management entirely to others, and principally to the cashier. That plaintiff was a resident of Minneapolis, and gave little attention to the business transacted by the bank. This is offered presumably in explanation of why he did not have actual knowledge of the want of consideration in the transaction between the defendant and the bank, because of which this note was given, to prove himself a holder in due course in fact. This is the equivalent of urging his own negligence and dereliction of duty under the banking laws as an excuse to enable him to establish good faith or actual want of knowledge of the infirmity in the paper, when he would have known such facts and possessed actual knowledge thereof had he performed the duties devolving upon him as president of a banking institution. A court can hardly recognize such a plea. Plaintiff cannot lend his name, and thereby the influence of his probity and wealth, to his resultant benefit as a stockholder and bank official, without incurring the duty of fulfilment of the obligations of the office, including those arising from the presumed notice imputed to him by law as a bank official of the bank's transactions in the ordinary course of its dealings. As the presiding officer of the board of directors, he should not be heard to say he did not know matters presumed to be within the actual knowledge of the board, as an excuse for failure to perform his official duties to the bank, its depositors, and creditors. In the words of Martin v. Webb, 110 U. S. 7, 28 L. ed. 49, 3 Sup. Ct. Rep. 428, quoted with approval in Magee on Banks & Banking, 2d ed. § 107, it is said: "Directors cannot, in justice to those who deal with the bank, shut their eyes to what is going on around them. It is their duty to use ordinary diligence in ascertaining the condition of its business, and to exercise reasonable control and super-

vision of its officers. They have something more to do than from time to time to elect the officers of the bank and to make declarations of dividends. That which they ought by proper diligence to have known as to general course of business in the bank, they may be presumed to have known in any contest between the corporation and those who are justified by the circumstances in dealing with its officers upon the basis of that course of business." In Balfour v. Fresno Canal & Irrig. Co. 123 Cal. 395, 55 Pac. 1062, quoted in Magee on Banks & Banking, 2d ed. § 108, it is said: "A corporation must be presumed to have full notice of all the facts which are known to its president, affecting its interest. It is his duty as the head of the corporation to report the same to the trustees, and it is usually conclusively presumed that he has done so. . . . The corporation has no ears, eyes, nor understanding save through its agents. The president is considered the head of the corporation, and it is his duty to report to the trustees information affecting the interest of the corporation, and the presumption is that he does so. Usually this is a conclusive presumption. If it be urged that in this instance it was not the president, but the cashier, who received notice of the want of consideration for the note in question, as he negotiated the loan, and that the cashier has more powers of management than the president, we answer, in the words of Bolles on Banks & Banking, 333: "There is no longer any essential difference in the authority exercised by them," cashier and president. So, what the cashier knew, the institution and its president in law knew. Of course where manifestly the president, cashier, or director, the presumed agent of the bank, the principal, is acting for his own interests, and from the nature of the transaction adversely to that of the bank or in fraud of the bank, for his personal gain or for that of others with notice thereof, in a suit by the bank or for its benefit a different rule applies, but such is without this case. Such exception is illustrated by cases similar to the following, *viz.:* E. S. Woodworth & Co. v. Carroll, 104 Minn. 65, 112 N. W. 1054, 115 N. W. 946; First Nat. Bank v. Persall, 110 Minn. 333, 136 Am. St. Rep. 499, 125 N. W. 506, 675; Iowa Nat. Bank v. Sherman, 17 S. D. 396, 106 Am. St. Rep. 778, 97 N. W. 12; Peoples' Sav. Bank v. Hine, 131 Mich. 181, 91 N. W. 130.

Respondent cites the decision of this court in American Nat. Bank v. Lundy, 21 N. D. 167, 129 N. W. 99, as sustaining his contention, and

states that the trial court, in denying the motion for new trial herein, relied upon that holding. It is unnecessary to comment on that case further than to say it is not here controlling. That decision turned upon a failure of proof of a defense and error in the admission of testimony in an action by the bank as indorsee and holder in due course against the maker of a negotiable promissory note, and the question there involved was as to the proof of and the amount of knowledge possessed by the cashier of the want of consideration for the note at the time he, acting in behalf of the bank, purchased the note for the bank. The doctrine of imputed knowledge to the bank of the facts known to the cashier is recognized, as it is not questioned; and the decision is based upon the sufficiency of said knowledge presumed to have been known by the bank, to overthrow the presumption that the bank was a holder in due course, and to constitute a defense. And what is there said concerning actual knowledge of the infirmity was said in connection with any duty of the bank as a purchaser to inquire for possible defenses, and that mere knowledge or notice of suspicious circumstances will not defeat a recovery; and that the provisions of §§ 6702 and 6703, Rev. Codes 1905, did not there operate to alter the well-established rule that our negotiable instruments law, in § 6368, permits the buyer of a negotiable instrument to be a holder in due course, without requiring him "to make inquiries as to the purpose for which it was given, or as to the existence of possible defenses. Bad faith is imputed only from knowledge or notice of the fraud or defenses. Mere knowledge of suspicious circumstances will not defeat a recovery;" which was the holding of this court before the passage of the negotiable instruments act in First Nat. Bank v. Flath, 10 N. D. 281, 86 N. W. 867. We may here state that we do not understand Walters v. Rock, 18 N. D. 45, 115 N. W. 511, decided under the negotiable instruments act, has been overruled or modified by American Nat. Bank v. Lundy, 21 N. D. 167, 129 N. W. 99. This in no wise conflicts with our holding in the instant case, to the effect that a bank president and director, and as such a managing officer of the institution, cannot be heard to claim that he had no notice of any infirmity in the instrument negotiated to him by his own bank; but that instead, the knowledge imputed to him as such officer, of the institution's inability to recover on the instrument because of want of consideration therefor, prevents him

from being a holder in due course, and that the same defenses available against the bank, in a suit by it to collect upon the note, may, because of his relationship to it, be set up in defense of his action.

Our conclusion is that this defense is available against this plaintiff's recovery. And defendant, having been precluded from proving his defense, should be allowed to offer evidence tending to establish the same under the allegations of his answer and the issues as joined. And that upon the proof as made, that this plaintiff is the president of this bank and therefore one of its directors, the defendant has laid sufficient foundation for the introduction of proof of his defense of want of consideration, which, if established, is as binding upon the plaintiff in this action as it would have been upon the bank had the bank instead sought recovery.

Appellant's contention being sustained as to the merits, necessitating a new trial, it becomes necessary to consider the error assigned on the trial court's ruling sustaining the demurrer to the counterclaims for damages specifically plead. We conclude that the demurrer to the alleged counterclaim asking damages for attorney fees was properly sustained, being covered by the statute authorizing taxing of the same as costs in lieu of attorney fees. The counterclaim for $15 for four days' lost time in endeavors to regain possession by rebonding is insufficiently pleaded, as it does not sufficiently appear that the time alleged to have been so spent was necessarily spent for such purposes. Under proper pleading, and on sufficient proof, we see no reason why defendant should not, if he recovers judgment, be allowed damages for loss of time consumed in regaining possession of his property. As to the counterclaim interposed for the sum of $15, it does not appear how the expense was incurred, it being impossible to determine from the answer whether the matter is a disbursement in suit or is a subject of claim for damages, and the demurrer thereto was properly sustained.

But that portion of the answer counterclaiming for deprivation of use and possession of said property for a period of four days, during which time said property was detained by plaintiff after it was taken from defendant under claim and delivery proceedings and before rebonding, and for which period defendant claims to recover damages in the sum of $30, the trial court erred in overruling the demurrer. "Upon the rendition of a verdict for the defendant, he is entitled to an assessment

of damages for the detention of the property and for the taking when wrongful; and this without regard to the fact whether the property has or has not been returned to him.   This is for the reason that the return of the property only discharges the judgment for 'its value,' and does not affect the defendant's rights to damages for its detention." Shinn, Replevin, § 639, citing Haskins v. Everett, 4 Sneed, 531; Buckley v. Buckley, 12 Nev. 423; School Dist. v. Shoemaker, 5 Neb. 36; Burt v. Burt, 41 Mich. 82, 1 N. W. 936; Hall v. Smith, 10 Iowa, 45.   "Set-off is not allowable in an action of replevin in the ordinary sense in which it is allowable in other forms of action, but damages growing out of the same subject-matter may be considered in reducing the damages claimed are allowable in the replevin action, and courts are inclined to give the action such flexibility as to adjust all equities arising between the parties in such action." Cobbey, Replevin, § 794, citing authorities. "And generally whatever demand the defendant has growing out of the same subject-matter as the plaintiff's claim may be recouped." Wells, Replevin, § 632.   In the words of Cobbey, § 795: "The subject-matter of litigation in replevin is the property mentioned in the complaint." Our statute relative to counterclaim generally, § 6860, provides that "the defendant may set forth by answer as many defenses and counterclaims as he may have," subject to the limitations contained in that section.   Under the first subdivision of that section, so far as this case is concerned, this counterclaim to be available must be "a cause of action arising out of the contract or transaction set forth in the complaint as the foundation of the plaintiff's claim or connected with the subject of the action." The case of Braithwaite v. Akin, 3 N. D. 365, 56 N. W. 133, upon which respondent relies, we do not regard as here applicable.   That decision cannot be considered as announcing the proposition that a cause of action for conversion cannot be set up as a counterclaim in an action upon a contract.   In the words of the opinion in Hanson v. Skogman, 14 N. D. 445, 105 N. W. 90, speaking of this decision, it is said: "The case as we read it does not so hold.   The court merely held that the cause of action for conversion attempted to be set up in that case 'had no connection, however slight,' with the transaction upon which suit was brought." And Hanson v. Skogman is authority for our holding if the damages sought be "connected with the subject of the action."   And the damages claimed arise from the dep-

24 N. D.—27.

rivation of the possession and use of the property mentioned in the complaint, and in the words of Cobbey on Replevin, above quoted, constitute the subject-matter of this action. In fact, the damages are occasioned by the exercise by the plaintiff of a legal right accorded him to take possession of the subject-matter of the action, the property, at the commencement of the action, rather than await the outcome of the litigation determining his right thereto.

Then, again, we regard § 7036, Rev. Codes 1905, as, by necessary construction if not in specific terms, granting the defendant the right to counterclaim for damages for use and deprivation of property. On this demurrer we must, of course, assume to be true the facts set forth in defendant's counterclaim, and are therefore passing upon the sufficiency of defendant's claim under the assumption of his recovery on the merits as to right to possession of the property. Such recovery by defendant under the pleadings can only be had if a total want of consideration be established for the note secured by mortgage. If defendant recovers in the main action, the verdict must conform to the provisions of § 7036, to be responsive to the issues. That section defines the verdict to be returned in every instance that may arise in claim and delivery. Subdivision 3 thereof defines the defendant's rights where the property has been delivered to plaintiff and where defendant recovers, and expressly provides that in such instance, if damages for detention of property are claimed in the answer, the defendant may recover therefor. Subdivision 4 of that section provides that where the property has, pending suit, been retained by the defendant, the jury must find the defendant entitled to such property where they find against the plaintiff. This provision is applicable where the plaintiff has not elected to take the property pending suit. The final provision of subdivision 5 of § 7036 is in our opinion intended to here apply. It reads: "Whenever the jury are so instructed they must find the value of specific portions of the property in controversy, or of the interest of either party therein, if less than its full value at the time of the taking, and shall also assess the damages if any are claimed by the party in whose favor they find sustained by reason of the taking and detention of such property." In other words, the party claiming damages through the taking and detention of replevied property, if entitled to recover therefor and with recovery for such damages not specifically provided for in the preceding

parts of the section, may, under this general provision, be permitted a recovery for such wrongful detention of such property taken. To that extent it is supplementary of the other provisions of § 7036, and also of § 6860, where a recovery is had on a counterclaim. Tittle v. Kennedy, 4 Ann. Cas. 68, and note, (71 S. C. 1, 50 S. E. 544); 34 Cyc. 416, subdiv. 4, and authorities.

One remaining matter deserves extended discussion. After the record on appeal was in this court for submission on the merits, appellant's attorney filed in this court affidavits of said attorney and the defendant, accompanied by an affidavit of Minckler, who had been cashier of this bank at all times in issue. With these affidavits was filed a written application to have the record here on appeal remanded to the district court of Benson county, that defendant might, on the record and said affidavits, "move for a new trial on the grounds of newly discovered evidence in this action;" and pursuant to said application, to determine whether to remand for such purposes, an order to show cause was issued by this court, summoning respondent "to show cause why an order of this court should not remove the record and files in said cause back to the district court of the second judicial district within and for Benson county, and the said district court be instructed to entertain an application by the defendant for an extension of time within which to move for a new trial of said action on the ground of newly discovered evidence, if the time for making said motion has expired." On the return day respondent filed a motion, supported by affidavits, asking the court "to quash the order to show cause." This motion is supported by the affidavits of McCarty, reciting at length the entire transaction. Of McCarty's affidavit we will speak later. On the hearing both parties filed written briefs, as well as made oral argument, with the result that the application to remand was denied by order of May 2, 1912. Thereafter the cause was heard on the merits of the appeal. Then an opinion prepared by the chief justice was filed, dismissing the appeal on the court's own motion, on the grounds that the matter stated in the affidavits of appellant on the motion to remand admitted the reception by defendant of $1,500 as consideration paid by the bank to him on the note in litigation, and that as the value of the replevied property in issue was less than the amount so received his defense thereto was wholly destroyed, and was established to be sham and fictitious. On peti-

tion a rehearing was granted and the case reopened and reargued. The affidavits filed upon which such summary action of the court was taken here follow:

"John Kepreta, being first duly sworn according to law upon oath deposes and says that he is the defendant in the above-entitled action; that the facts in connection with the making and delivery of the note for $2,000, secured by the mortgage under which plaintiff is by this action attempting to recover, are as follows, and not otherwise: That in the fall of 1908, I had immediate use for the sum of about $1,800, and made arrangements with the Farmers & Merchants State Bank of Knox, of which said plaintiff was president then, whereby said bank would advance me the money needed, and it was agreed at the time that affiant was to allow the said bank a bonus of 10 per cent on the amount agreed on to be advanced, and in addition thereto was to pay interest at the rate of 12 per cent per annum from the date of the note; that the total sum of money which was agreed on to be advanced was $1,800, and no more."

Also was filed the following affidavit:

"J. A. Minckler, being first duly sworn, on my oath depose and say that I reside at Knox, North Dakota, and was a resident of Knox, North Dakota, during the year 1908, and that during said year I was the cashier of the Farmers & Merchants State Bank of Knox, North Dakota, of which said bank the above named plaintiff, John McCarty, was president; that in the fall of 1908, one John Kepreta made an application to said bank through me as its cashier, for a loan of sufficient money to take up his then outstanding indebtedness, which was established at that time to be about $1,800 over and above the value of his crop for that year, then threshed but unmarketed;

"That in said fall of 1908, after the said application of the said Kepreta was made to me, I had a conversation with the said John Mc-Carty, in the month of October, 1908, and just prior to the taking of the $2,000 note involved in the above-entitled action from John Kepreta, in which I told him the proposition and arrangement I had with Kepreta, which was as follows: John Kepreta was to execute the said note of $2,000, and was to receive actually only $1,800, and the other $200 was to be a bonus for making the said loan; and he was to give the note for $2,000, and pay 12 per cent interest on the whole $2,000.   John Mc-

Carty replied by telling me to go ahead and make the loan on that basis, and that he would take it up for himself, instead of the bank, provided I could obtain a sufficient chattel mortgage to secure the $2,000 note. On the 12th day of November, 1908, John Kepreta signed the note for $2,000 involved in this action, and also the chattel mortgage securing the ' same, and involved in this action, and on which the action is based. The Farmers & Merchants State Bank of Knox, North Dakota, *advanced to John Kepreta thereon, on the 12th day of November, 1908, the sum of* $1,500, and the note was, on the 12th day of November, 1908, registered in the books of said bank and carried thereon at a $1,500 loan.   On the 8th day of December, 1908, John McCarty came into the bank at Knox, and the said note and mortgage were turned over to him by me, and he paid for the note and mortgage the sum of $1,813, the $13 of which represented the interest at 12 per cent on the $2,000 note for twenty-six days, which had accrued thereon to that date, *and John Kepreta's account at said bank was credited with the sum of $300,* and no more; *that the sum of $1,800 was all that said John Kepreta ever received from the Farmers & Merchants State Bank of Knox, North Dakota, for the said note.*   The $13 was credited to the interest account, and the $1,500 item was canceled from the notes and discounts; that at the time this John Kepreta note of $2,000 was taken by said plaintiff, John McCarty, he also bought a note of one O. P. Rambo, from the said Farmers & Merchants State Bank of Knox, of the sum of $725, and accrued interest thereon in the sum of $5.80, which, added to the $1,813, made a total of $2,544.70, for which sum he gave a check on the Security National Bank of Minneapolis, in the state of Minnesota, dated December 8, 1908, and which was paid by said Security National Bank on December 10, 1908.

"Dated this 4th day of April, 1912."

We italicize that part of the foregoing particularly under consideration.

With these affidavits was also filed that of one of the attorneys of record for defendant and appellant.  He recites the history of the trial, and the appeal; "that on the 4th day of April, 1912, for the first time this affiant, and also the defendant, discovered that there was a good, meritorious, and valid defense to the whole, or to a great part, of the claim of the plaintiff, and also discovered evidence to substan-

tiate his defense in the said action, that is, that the said McCarty, plaintiff, was not a bona fide holder of the said note and mortgage, but that he took the same subject to the defense of *mala fides,* and was not a purchaser in due course, and without notice, and that his evidence to the effect that he knew nothing of any defense or defect in said note for $2,000 was false; and that the said plaintiff knew, before the said note was taken, all of the facts and circumstances in connection with the execution and delivery of the note and mortgage, and was a party to the whole transaction from its inception to the close thereof, and at the time the same was indorsed to him; and also this defendant can now prove, and has discovered evidence to show, that the evidence of the plaintiff, wherein he stated that he paid the full face of the note and interest thereon to the date of the purchase of the same by him, was and is wholly false; but this defendant can prove that he did not pay the full face of said note; that he only paid the sum of $1,813 for the same, and that he knew when he took the same that said note was usurious and was procured from the said Kepreta by fraud; that this defendant is now able to and can and will prove, if given an opportunity, that the said plaintiff, McCarty, was not a bona fide holder of the said note and mortgage, and that he knew the same was usurious when he took the same from said bank, and that he knew the nature of the note and the usurious character of it, and made the agreement for the taking of it through the cashier of said bank, one J. A. Minckler, as shown by the affidavit of said Minckler, which is hereto attached and made a part hereof by reference; and these facts this affiant now states can be proven by the said Minckler, and also by one Bidne, who was at that time an employee of said bank, and who was present at and heard the conversation between Minckler and the plaintiff, McCarty, which is referred to and set out in the affidavit of said Minckler hereto attached and made a part of this affidavit; and also by the books of said bank." Then follows a statement tending to show due diligence in making this application, and the reasons why such newly discovered evidence was not procured and used at the former trial; also: "that John Kepreta is an ignorant, illiterate foreigner, and is unable to understand the nature or effects of his acts, and was too ignorant to, and in fact did not know anything of the plaintiff, McCarty, in the transaction whatever, and did not know the legal effect of usury in connec-

tion with the giving of said note, and did not, at any time, inform the said affiant herein or any of his attorneys of any fact or facts showing usury in connection with the transaction, but always claimed and maintained that he did not get any part of the consideration for which the note was given."

"That said evidence is vital and very material to the defense in this action." "That the time fixed by the statute of the state of North Dakota within which to move for a new trial has expired in this case."

On these affidavits the opinion was based, short-circuiting the merits of the appeal and summarily dismissing it, working an affirmance of the judgment appealed from, on the theory that the affidavits constituted a solemn, written, judicial admission made in the case that the defense was without merit. In considering whether this conclusion was correct, many matters other than the statements contained in the affidavits themselves are to be considered. We here observe that the affidavits have in no wise misled the opposing party, nor have they been acted upon by him, but instead were acted upon by the court on its own volition. In fact, until the decision was rendered we have every reason to believe respondent must have been as wholly in ignorance of any such contemplated action of this court or the effect of these affidavits to work such dismissal as was appellant, who filed them. There is, then, no element of estoppel in this case. The question for determination is whether the matter contained in the affidavits, taken in connection with the matters embraced in the entire case, and issues presented, and now also in the light of the explanation made of their filing, as explained in the petition for rehearing and the subsequent argument of appellant, must or should be taken by this court as a judicial admission of want of merit in the defense litigated in the lower court and now before us on appeal. Most surely, before thus treating property rights presented in good faith on an appeal, this court must be certain that such disposition is the only reasonable one to be made, consistent with the rules of procedure applicable. And such we find the declared law. Chamberlayne's Evidence, vol. 2, § 1242, from which we quote: "Judicial admissions should receive a reasonable construction. Thus it will not be assumed, without strong reason, that an admission by counsel covers the point on which the entire case turns. The rule has even been stated to be that where the concession of counsel is ambiguous its mean-

ing should be determined by the party who made it." Citing Hoffman v. Bloomsburg & S. R. Co. 143 Pa. 503, 22 Atl. 823; Wright v. Dickinson, — Mich. —, 42 N. W. 849. And when we find the admission so sought to be given the force of a judicial admission is contained in some affidavit or pleading subsequently amended or superseded, it must be a judicial admission beyond all question to thus operate to foreclose the rights of appellant regardless of merit. Wigmore, Ev. §§ 1064, 1067, 1075 and 2594. The filing of the affidavit of a third person as a part of a record in a case, and for a specific purpose, may be the adoption of such affidavit by the party in whose behalf it was filed, and the affidavit become the statement of a party to the suit for the purpose for which it was filed, and may constitute an admission. Wigmore, Ev. § 1075. But whether such admission be conclusive of the interests of the party to the litigation, or whether it be an ordinary admission, the probative force of which is to be weighed as mere evidence, is dependent upon whether the admission amounts to a judicial admission, or instead is a mere quasi, extra-legal, or ordinary admission. The distinction between these classifications, as ordinarily drawn by the the text-book writers, are clearly shown in the exhaustive treatises on Evidence of Wigmore and Chamberlayne. And especially consult the latter at chapter 17, beginning at § 1232.

A judicial admission, strictly speaking, is a matter determining procedure regardless of proof in the case or probative force of the admission. A plea of guilty, an unqualified admission of the facts of a case to avoid a continuance, or any stipulation or admission conceding a matter in issue and waiving proof, as a formal admission of fact or issues in a pleading, are examples. A judicial admission relates primarily to procedure. Chamberlayne, Ev. §§ 1234 et seq. Other admissions of various kinds are matters primarily of evidence only, more or less conclusive, according to the weight to be attached to them as evidence only, and their force or effect being determined with all the facts in the case and on trial. With this in mind, let us determine whether, under all the circumstances, the contents of this affidavit amount to written judicial admission, and if so, whether any discretion lies as to the effect of the same upon this suit; that is, whether the court has any alternative than to dismiss this appeal.

We first notice that the affidavits are filed as a part of procedure to

procure a new trial upon a specific ground, *viz:* that of newly discovered evidence, with such affidavits reciting such newly discovered evidence. No intimation is given in the application, nor in the brief accompanying it, of any change of position by appellant on the merits should he be granted a new trial, and nothing contained in the affidavits is inconsistent with the position maintained by him throughout the trial below or the matters urged on this appeal. He has contended from the first his right to successfully defend because of a total want of consideration for the note as between defendant and the bank, and based upon either the actual knowledge had by the president, this plaintiff, of such fact, or constructive or imputed knowledge by law in him of such total want of consideration, and arising because of his relationship to the payee in the note, the bank; with the conclusion in either case that he may defend against plaintiff as he could have done against the bank, on the grounds of a total want of consideration. Under defendant's theory of his defense, and in line with offers of proof on trial, anything establishing usury in the note imputes conclusively to the president of the bank, this plaintiff, knowledge of the facts and circumstances under which the note was executed and delivered, including a total want of consideration. And such is the law under the authorities heretofore cited in this opinion. The affidavits presented, then, while tending to establish usury, warrant no assertion that defendant has changed his defense from that pleaded and tried below, based upon such alleged total want of consideration. And the affidavit of Minckler tends to establish actual knowledge of the usurious nature of the transaction. And in this connection we must remember that, under the proof and these affidavits, if defendant's defense is true and meritorious, this plaintiff and Minckler were concerned jointly in working a fraud upon defendant. Then in reason, unless unavoidable, the mere affidavit of either Minckler or McCarty at this stage of proceedings should not be permitted to work a forfeiture of the rights of defendant, perhaps to their own mutual benefit. But let us analyze these affidavits. That of defendant recites merely an agreement whereby he was to receive $1,800 for a note of $2,000. It is of significance that the affidavit of his attorney, filed with the affidavit of Minckler, still asserts that defendant "always claimed and maintained that he did not get any part of the consideration for which this note was given." And that he pur-

poses, if given a new trial, to use testimony obtainable from Minckler and the books of the bank in establishing actual and imputed knowledge in plaintiff of his defense of total want of consideration. It is true that he, as attorney for defendant, has filed in this court the affidavit of Minckler, stating that he, with the knowledge of plaintiff, entered into an agreement to exact, in effect, usury, from the defendant. And that the bank of which he was cashier "advanced" to Kepreta $1,500, and thereafter Kepreta's "account at said bank was credited with the sum of $300, and no more." But this affidavit does not state positively and unequivocally that Kepreta was paid $1,800, or any part thereof, or that he received any cash or its equivalent from said bank in the sum "advanced" as the consideration for the note in suit. These affidavits come into this record as a matter other than that of record in the case, and if they may be considered for any purpose other than that for which they were filed, then most certainly the explanation of said affidavits as contained in the written argument of appellant filed on this petition for rehearing, and, as advanced orally on rehearing, may be considered on this question. Concerning this, defendant states that he is ready to prove that, notwithstanding the affidavit of Minckler, defendant "never got a cent of the proceeds of this note," and "could have shown you that this money was never checked out," "was never intended to be checked out, but was to be used for another purpose," quoting from the written argument. So that from the standpoint of the defendant both statements may be true, as could be by the simple act of bookkeeping, by the crediting on the books such "advance," but refusing to honor checks on it or any right of defendant to apply it, resulting in defendant never actually receiving a dollar of the so-called "advances." Or again, this bank may have wrongfully applied such advancement in disregard of defendant's legal rights, with the result that he has received nothing as a consideration for the loan, and would have the right to assert such total want of consideration against the bank and its president, this plaintiff.

And at this place we may briefly consider, with Minckler's affidavit, the explanation of the plaintiff himself, also made by his affidavit, in support of his claim of absolute ignorance of any want of consideration or usury in the note. Contrasting the affidavits of McCarty and Minckler, it is noticeable that $200 less than the face, and interest, for two

notes, this one in suit, of $2,000, and another note of $725, was paid
by McCarty to the bank. Minckler claims this $200 was discounted
from this note in suit; McCarty that it was discounted from the $725
note instead. Minckler's affidavit states the exact amount paid by
McCarty to the bank to have been, in items, $1,813 for the note in suit,
and interest thereon, and $725 and $5.80 interest thereon, or a total
of $2,544.70. McCarty admits paying only this amount for them.
The only disagreement between the two is as to which note was dis-
counted. McCarty's affidavit admits that but $1,800 of the note in
suit was credited on the books of the bank, "and as I understood it, that
Minckler wanted the other $200 to cancel his personal claims against
Kepreta. Minckler had charge of the books of the bank at the time I
purchased these two notes, and I paid no attention to the same, or any
of the entries that he had made in connection therewith, until the exam-
ination just spoken of, made by me about the time this suit was com-
menced; that if there was any juggling of the books it was done by said
Minckler to serve his own purpose." Minckler charges McCarty with
taking usury in connection with this note in the sum of $200. Mc-
Carty charges Minckler with taking $200 for his (Minckler's) "per-
sonal claims against Kepreta," and intimates a possible "juggling of
the books" of the bank. Should justice work overtime under the cir-
cumstances disclosed by these uncertain affidavits to deal summarily
with the defense here plead, in the face of such admissions, all *dehors*
the record and after judgment? Rather it would seem, as heretofore
stated, that any substantial doubt should be resolved in favor of a trial
on the merits, under these admitted circumstances surrounding the
giving of this note. Appellant has also, by written statement and oral-
ly on argument, explained Minckler's affidavit, from which explana-
tion it appears that, in addition to what has heretofore been said, the
affidavit of Minckler was dictated by Minkler, concerning the contents
of which Minckler would permit no change, so that it was either use
the affidavit as it was signed, or abandon any benefits appellant might
receive under it on an application for a new trial.

While we do not believe that any conspiracy existed in the offering of
this affidavit, as between Minckler and McCarty, inasmuch as none of
the counsel in the case would countenance such practice, and all were in
ignorance of any such application of them as made heretofore by the

court, yet to say, under these circumstances, that appellant must be bound as by a judicial admission by every statement contained in Mincklers' affidavit, and defendant's rights under the appeal abrogated, would be to put a premium upon conspiracy and permit a party to a suit and a witness, pending a meritorious appeal, to rid themselves of a possible future disagreeable retrial.

But we are not bound to dismiss the appeal, even though we grant that the affidavit filed may amount to a judicial admission. A court may, at its discretion, upon proper showing, relieve from a judicial admission. See Greenleaf on Evidence, 16th ed. vol. 1, § 206, from which we quote: "Where judicial admissions have been made improvidently and by mistake, the court will, in its discretion, relieve the party from the consequences of his error by ordering a repleader, or by discharging a case stated, or the rule, or agreement, if made in court. Agreements made out of court between attorneys, concerning the course of proceedings in court, are equally under its control, in effect, by means of its coercive power over the attorney in all matters relating to professional character and conduct." See also 1 Enc. Ev. 476.

We quote from § 1240, Chamberlayne's Evidence, as follows: "While a formal judicial admission constitutes the *levamen probationis* until modified or withdrawn, the admitting party is not necessarily precluded by it. A showing of mistake or inadvertence may secure him relief from the court. The entire matter is within the administrative function of the court. If it shall be made clearly to appear to the judge that a particular formal judicial admission has been made imprudently and by mistake, the court may, in the exercise of its administrative powers, relieve parties from the consequences of their mistake, by allowing them to withdraw the admission. In the same manner, a party under the rules of practice prevailing in a particular jurisdiction may be allowed to alter the admissions contained in his pleadings, by an amendment,"—citing authority. To the same effect see § 2590, Wigmore on Evidence, reading: "The vital feature of a judicial admission is universally conceded to be its conclusiveness upon the party making it, *i. e.*, the prohibition of any further dispute of the fact by him, and of any use of evidence to disprove or contradict it. In view, however, of the commendable purpose which leads (or ought to lead) to

the voluntary making of admissions, it is always, and properly, said that the trial court may, in discretion, relieve from this consequence."

Most authorities cite and quote from Prestwood v. Watson, 111 Ala. 604, 20 So. 600. In the note to Wigmore on Evidence we find the following quotation from said case, and here particularly appropriate: "Such agreements are sometimes made to avoid continuances or for some other specific purpose, and by their terms are limited to the particular occasion or purpose, and of course lose all force when the occasion has passed or the purpose has been accomplished."

There can be no doubt of the right of the court under the authorities, even though the affidavit of this third party be considered as a judicial admission of defendant, to relieve defendant from its force by ignoring it except for the purpose of which it was filed, in this case long ago ruled upon by this court and superseded by subsequent proceedings concerning the merits of the case on appeal.

Then, too, his affidavit was filed, not by the party defendant, but by his attorney; and if it be held to have been adopted thereby as the declaration of the party, it must have been the act of the attorney, perhaps unknown to or not understood by the client, in thus using the affidavit of a third party that would be construed as decisive of this case against said client. And in the affidavit of the defendant, filed with the affidavit of Minckler, we find no statement of knowledge of the contents of Minckler's affidavit or any corroboration thereof that goes to the extent of verifying the statement in Minckler's affidavit that money was advanced defendant as the consideration for said note. In fact, in the affidavit of the attorney filed with the other two affidavits, we find the statement, "that the defendant has always maintained that he never received anything as consideration for the note," which, if considered with the affidavit of Minckler and given the same construction that must be given to Minckler's affidavit, to allow the latter to constitute a judicial admission would amount to a denial or repudiation of the affidavit of Minckler, filed contemporaneously with the Minckler affidavit. The admissions, if they may be so construed, contained in Minckler's affidavit, are but analogous to admissions made in a pleading concerning which much conflict exists as to the extent to which a client is bound when the pleadings embody judicial admissions. 16 Cyc. 968, where it is said that it "would be pushing the relations of attorney and

client to an unwarranted extent to hold the client responsible for any inconsistency between statements made in the pleadings." It is doubtful if the act of the attorney in the filing of this affidavit, conceding that it be a judicial admission, would bind this defendant, without proof of knowledge in the defendant of the contents of said affidavit.

In what has been said heretofore it has been taken for granted that the statements contained in Minckler's affidavit amount to a judicial admission. To give such effect would overlook the fact that the application to remand, to support which they were filed, was denied, and is no longer before us for review or for any other purpose. The application and the supporting affidavits are all superseded matter, and are no longer before the court for any purpose, and any statements therein may only still "be competent as extrajudicial admissions. To be so used, the superseded pleading must be introduced in evidence, must be shown to have been originally made as a statement of fact, and connected directly with the party himself, as having been made, or authorized and inspired by him. It is not sufficient that the attorney signed and filed the original pleading." 16 Cyc. 971. This affidavit should not now be treated as more than an extrajudicial admission.

But it is urged that in any event the affidavit having been offered by defendant, all statements therein must be taken as true, and no part of it can be questioned. Wigmore on Evidence, § 1075, effectively answers this contention.

"If a party expressly states that a certain piece of testimony by another person is correct, there can be no question that it becomes his statement by adoption, and is receiveable as his admission. But does he by implication approve and adopt as his all the depositions, testimonies, and affidavits that are offered on his behalf in a litigation, so that in a subsequent litigation these may be used against him as his admissions? It is true that the rule against impeaching one's own witness was once explained upon the theory that a party guarantees the credibility of his witness and (by inference) the correctness of the witness's statements." § 898. "But that impossible theory has long been exploded, and cannot serve here." § 899. And as an extrajudicial admission under all of the authorities, any statements contained in these affidavits might be explained, qualified, or controverted on retrial.

For the foregoing reasons we do not feel justified, from this partic-

ular affidavit alone, to conclusively presume the defendant received $1,500, or any money at all, as the consideration for the note in suit, the affidavit being general and uncertain, and contrary to the claims of defendant in his pleadings, his offers of proof on the trial, and the theory of his defense throughout. Besides, the explanations of his attorney as to how the affidavit was given, and why the same was filed for use only for the particular purposes and application made, established beyond question the fact that, in an endeavor to procure a new trial, his counsel have, without any concealment or endeavor to mislead, and that this court might know the entire situation, filed this affidavit of a third party, who, should he testify to all the matters therein recited, would not necessarily preclude defendant's defense, but would leave to the jury an issue on the credibility of the third party and the defendant. We feel that because defendant has disclosed the part of the newly discovered testimony that would be prejudicial to him as well as the beneficial portion, he should not be penalized therefor by using the affidavit for a purpose wholly without the contemplation of both parties, in a manner that would, in effect, work a forfeiture of his appeal on the merits, when the discretion rests with us as to whether such an extreme holding shall be made.

This case is remanded for a new trial, appellant to recover his costs and disbursements on this appeal, but excluding those on the reargument had on the rehearing granted herein.

SPALDING, Ch. J. ( dissenting). While disposed to think it might be the part of wisdom for the legislative assembly to prohibit an official of a state bank from dealing in commercial paper taken by the bank, or at least from asserting a good faith purchase from the bank by himself, I am by no means clear that the law as it now stands considers a bank official, and particularly one who does not participate in the active, personal management of the bank, in any other light than as a stranger to the entity known as a bank, in such dealings; and the authorities cited to the contrary in the majority opinion on this question are not convincing, especially when the whole of each is read. But, as I deem it unnecessary to pass upon the merits of this case, I refrain from any expression of opinion thereon.

I am of the opinion that the decision is wrong, and I cannot concur

therein. Plaintiff, at the time this action was brought, was president of a small bank at Knox, organized under the state law. He resided in Minneapolis, Minnesota, something like 400 miles from Knox. He had nothing to do with the personal management of the bank, but visited it two or three times per year, as suited his convenience. The man Minckler was cashier and the executive officer. The loan was made by Minckler and subsequently the note was purchased from the bank by McCarty, and, as the record stands, *in the utmost good faith and without knowledge or suspicion, or even grounds for suspicion, of any defense in fact.* On the maturity of the note, payment being refused, this action was brought to recover possession of the chattel security; and an answer was interposed setting up, as a sole defense, total want of consideration for the note, and alleging a bad-faith purchase by McCarty.

In April, 1912, after appeal from the judgment herein, defendant submitted a motion to have the record remanded to the district court to enable him to submit a motion therein for a new trial on the ground of newly discovered evidence. That motion was argued in this court and denied, and the reason for its denial was the fact that the allegations of the affidavits on which the motion was predicated negatived the defense contained in the answer, and that, although there might be a partial failure of consideration, such affidavits showed that a defense of partial failure of consideration would be of no avail, as plaintiff would still be entitled to possession of the security for foreclosure purposes. Subsequently the case was argued on the merits, and this court, after very careful consideration, agreed on the disposition of it, and dismissed the appeal. A most remarkable document was subsequently filed in this court, asking a rehearing. The court decided, in view of all the circumstances, it was best to give the parties an opportunity to be heard on the dismissal of the appeal, and on the rehearing this was done. Nothing developed that was unknown to the court at the time the original opinion was written in any way tending to diminish the force of the decision dismissing the appeal. On the contrary, it seems to me that the reasons for doing so are emphasized at this time.

I shall not set out the affidavits presented, as they are sufficiently stated in the latter part of the opinion of my learned associate. It must be borne in mind that the defense pleaded was total want of considera-

tion. Now, the affidavit made by the defendant himself, presented to support the motion, states that arrangements were made with the bank whereby it was to advance to him money needed for certain purposes; that it was agreed that he was to allow the bank a bonus of 10 per cent on the amount agreed on to be advanced and to pay interest in addition; that the total sum of money which was agreed on to be advanced was $1,800, and no more. Defendant adroitly ends his own affidavit at this point, from which his version of the transaction is continued by Minckler. Now, the version given by the defendant himself conflicts with and destroys the defense on which he was standing at the trial in the district court. The agreement to advance money to him was a sufficient consideration for the note. If he relied on a subsequent failure of consideration, or partial failure, he should have so pleaded; but this would have been useless to him, because McCarty could maintain his action if anything remained due on the note, or so long as it was proved that there was any consideration. I do not know how a stronger expression could be used indicating that $1,500 was paid to the defendant, than was used in the affidavit made by Minckler, presented at the time the motion was made, vouched for by the defendant in so presenting it, wherein he says the bank advanced him $1,500 in cash, and gave him a credit on its books for $300 more. It may be that the affidavits do not warrant a statement which was made in our former opinion, to the effect that defendant desired to change his defense from want of consideration to usury. Yet, notwithstanding the strenuous contention of counsel that we were not justified in this statement, in view of the affidavit made by counsel himself, we think we had some reason for concluding that this was the real purpose for which the affidavits were made. Counsel made an affidavit in which he stated that, "on the 4th day of April, 1912, for the first time this affiant, and also the defendant, discovered that there was a good, meritorious, and valid defense to the whole *or to a part* of the claim of the plaintiff." And in the same affidavit he refers to the knowledge of the plaintiff in this manner: "And that he knew when he took the same that said note was usurious. . . . That this defendant is ..ow able to and can and will prove, if given an opportunity . . . that he (plaintiff) knew the same was usurious when he took the same from said bank, and that he knew the nature of the note and the usurious character of it, . . . and these

24 N. D.—28.

facts this affiant now states can be proven by the said Minckler." But, however this may be, the defendant is, or ought to be, bound by his own affidavit. He has predicated his motion upon it, and upon the affidavit of Minckler and that of his counsel; and it seems to me to be trifling with justice to hold that he may blow hot for one purpose and cold for another, as the necessities of his case may require; that he may assert Minckler is telling the truth in part of the affidavit and falsifying in another portion; or that he may aver at one point in the litigation that there was never any consideration, and at his convenience change his assertion to the admission that he had received $1,800 as the consideration, and yet hold the other party bound by all the conflicting allegations of the defendant, who is bound by neither. Defendant moved himself out of court unless this court is maintained for the purpose of gratifying the curiosity of idlers who wish to submit moot questions. This is not affected by the fact that the court did not dismiss the appeal immediately after the motion referred to was made. The full force of the affidavits undoubtedly did not impress itself upon the minds of the court at that time. I quote from the first opinion, to which all members of this court then agreed:

"From the solemn declarations, under oath, of the defendant and his witnesses, it is clear that the defense on which he stood in the district court, on which the case was tried and judgment entered, and on which the argument of the appeal proceeded in this court, was purely fictitious, sham, and false. To reverse the judgment now would be to permit the defendant to set up a defense, stand on it two years, through the district court into this court, knowing all the time that it was false, get a decision in his favor on some error in the admission or exclusion of evidence relating to the false issue, mulct the plaintiff for costs, and then adopt a new theory and a new defense, and solicit the assistance of the courts to relieve him from the fraud perpetrated upon his counsel and the courts."

"It is not a case where the defendant relied on other parties for knowledge of his defense. He knew at the time his answer was prepared that he had in fact received consideration for the note, just as well as he did when, on the 6th day of March, 1912, he came into this court seeking to abandon his defense and substitute a new and different one, and was denied such relief. His attorneys were ignorant of the

facts, but this did not relieve him from responsibility or from the duty to disclose and make the defense which he claims to have had, rather than one which he knew he did not possess. . . ."

"If courts can be played and juggled with in this manner they deserve to become subjects of ridicule and contempt. If the money of the taxpayers can be collected to maintain courts engaged in settling issues which are confessedly fictitious, every taxpayer may well protest and every party to bona fide litigation has just ground for complaint at delay in the conduct of his litigation occasioned by the time and energy of the court being devoted to questions confessedly without merit."

We further stated:

"In no view of this case does the verdict and judgment work injury or hardship to the defendant. The value of the property involved was stipulated by the parties to be $875,—more than a thousand dollars less than the face of the note, and less than half the amount that the defendant confesses he received as the consideration for the note."

A usurious note is not invalid, and plaintiff was entitled to the possession of the security if any part of the debt was due and unpaid. Appellate courts, on attention being called to the fact that questions presented are no longer concrete, decline to act on them. See: Re Kaeppler, 7 N. D. 307, 75 N. W. 253; Foote v. Smith, 8 Wyo. 510, 58 Pac. 898; Sutcliffe v. McSweeney, 102 Ga. 807, 30 S. E. 268; Meyer v. Prichard, 131 U. S. CCIX, Appex. and 23 L. ed. 961; Berry v. Des Moines, 115 Iowa, 44, 87 N. W. 747; Hice v. Orr, 16 Wash. 163, 47 Pac. 424; State ex rel. Daniels v. Prosser, 16 Wash. 608, 48 Pac. 262; Territory ex rel. Hubbell v. Dame, 13 N. M. 467, 85 Pac. 473; Lindley v. Atchison, T. & S. F. R. Co. 47 Kan. 432, 28 Pac. 201; Oscanyan v. Winchester Repeating Arms Co. 103 U. S. 261, 26 L. ed. 539; The Harry, 9 Ben. 524, Fed. Cas. No. 6,147; State ex rel. Hahn v. Westport, 135 Mo. 120, 36 S. W. 663; Watkins v. Huff, 94 Tex. 631, 64 S. W. 682; Southwestern Teleg. & Teleph. Co. v. Galveston County, — Tex. Civ. App. —, 59 S. W. 589. Examination of these cases will disclose that they originally presented questions for determination. In the case at bar one was presented, but one which, in fact, did not exist, and this is conceded by the defense in presenting the affidavits of Kepreta and Minckler. Courts are constantly acting upon statements of counsel made on argument, waiving assignments of error contained in briefs,

and concessions made by counsel that issues are narrower than are stated in their briefs, and on many similar questions; and we see no reason why the solemn declarations of the appellant, made in the manner indicated, should not serve the same purpose. In Oscanyan v. Winchester Repeating Arms Co. 103 U. S. 261, 26 L. ed. 539, the Supreme Court of the United States says: "The power of the court to act in the disposition of a trial upon facts conceded by counsel is as plain as its power to act upon the evidence produced." And: "In the trial of a cause the admissions of counsel, as to matters to be proved, are constantly received and acted upon. They may dispense with proof of facts for which witnesses would otherwise be called. They may limit the demand made or the set-off claimed. Indeed, any fact, bearing upon the issues involved, admitted by counsel, may be the ground of the court's procedure equally as if established by the clearest proof. And if, in the progress of a trial, either by such admission or proof, a fact is developed which must necessarily put an end to the action, the court may, upon its own motion or that of counsel, act upon it and close the case."

In Re Kaeppler, 7 N. D. 307, 75 N. W. 253, the appellant instituted, under the state law, involuntary insolvency proceedings against the respondent, who contested them. The court found in favor of the respondent, dismissing appellant's petition. An appeal was taken to the supreme court. In the meantime respondent himself filed a voluntary petition in insolvency proceedings, and thereupon was adjudged insolvent, and the court declined to pass upon the question presented on the appeal from the judgment dismissing appellant's petition, and held that in such cases and all similar cases the appellate court will dismiss the appeal on the ground that judicial tribunals are not organized for the purpose of rendering decisions which can be of no possible advantage to the parties to the litigation. And numerous authorities are cited, to which we call attention, supporting the court's conclusion, most of them cases where the condition arose after the appeal had been perfected.

Counsel's great excuse is that his client is ignorant, and could not comprehend and did not understand court proceedings or the effect of any given set of facts in law or otherwise. This may be conceded, but it in no manner excuses appellant for concealing the facts regarding the transaction from his counsel. He knew the facts about it, whether he knew what part of them might constitute a defense or not. I do not

deem it a question whether the affidavits or attitude of appellant have misled plaintiff, nor whether he has acted upon them. The question is, "Shall this court devote its energies—of which this case has taken its share at least—to the solution of questions not in litigation?" The explanation of counsel furnishes no solid ground on which to stand. I have no doubt that counsel was surprised at the dismissal by the court on its own motion. He had no occasion to be, however. The zeal of counsel often leads them beyond the mark, but that does not warrant a court of last resort in shutting its eyes to the pleadings or admissions on one side of a case. The affidavits presented showed conclusively that he could not maintain, on a new trial, the defense interposed and relied upon at the former trial, and the facts disclosed revealed a total lack of any other defense in an action of claim and delivery, and, instead of counsel trying to shield his client after the facts were disclosed to him, he should no longer permit this court to be imposed upon, but should himself move a dismissal of the appeal.

It is said that this affidavit does not state positively and unequivocally that Kepreta was paid $1,800, or any part thereof, or that he received any cash or its equivalent from said bank in the sum advanced as the consideration for the note in suit. This is a mere distinction without a difference, when the affidavit says that the bank advanced Kepreta $1,500, and no more. "Advance,—to furnish, as money or other value, before it becomes due, or in aid of an enterprise; to supply beforehand, as a merchant advances money on a contract." Webster's International Dictionary. The meaning as used in these affidavits is clear. It means money paid by the bank to Kepreta at the time or before he gave this note.

His affidavits are something different from the ordinary affidavit which may be used in evidence as indicating that a party has taken conflicting positions on a question, but they were here solemnly vouched for by the appellant himself. No court should permit a party to profit by and speculate on his ability to draw affidavits of a fine-spun sort for purposes of delay, and when he intermingles facts showing his position on the merits false, let him be heard to say that it should take notice of only those allegations favorable to him. A great deal might be said on this subject, but it seems to me that its naked statement ought to be sufficient. It is very easy to find authorities apparently supporting any

proposition. The defense was total want of consideration. The affidavit of defendant and his witness both show a valuable consideration; and even had the defense been failure of consideration, they concede the receipt of the amount the note represented within $200, and hence show no defense to either form of action. The defendant presents these affidavits as entitled to the fullest credit. The decision, in effect, holds them not binding, because defendant would be permitted to impeach them on trial and to have a jury pass upon their truthfulness.

While this may or may not be correct, I do not deem its correctness of much importance. Neither do I consider the question of estoppel necessarily controlling. For the purposes of this discussion it may be conceded that the defendant was not, by the adoption and presentation of the affidavit of Minckler, estopped to prove a partial failure of consideration. This would not help him, for the reasons hereinbefore stated. Neither should it matter if he may be allowed to impeach these affidavits on a retrial. For the same purpose this may be conceded. From this standpoint, is it the part of wisdom, does it tend to promote justice between litigants, is it a wise use of the powers and functions of a court, to devote its time to considering such matters, and permit the defendant to make repeated changes in his attitude toward the litigation, taking contradictory and conflicting positions with reference to the rights of the plaintiff, when, if his statements are accepted at their face, they conclusively show that he has no defense to the action brought by the plaintiff?

But is it simply a question of evidence? Let us inquire what Mr. Chamberlayne, an authority cited to support the decision, says. "For forensic purposes, admissions may be classed as judicial or extrajudicial. The judicial admission is one made on the record or in connection with the judicial proceedings in which it is offered in evidence. An extrajudicial admission is one *in pais,* not made in court for the purposes of the case on trial in which it is offered." 2 Chamberlayne, Ev. § 1233. And, again: "According to the proportion in which the elements of procedure and logic respectively enter into their effect, judicial admissions may be treated in two general classes,—formal judicial admissions and those which are informal. In case of the formal judicial admission, the influence of the element of procedure is supreme. That of logic is practically absent. This fact removes formal judicial

admissions, properly speaking, entirely from the domain of evidence. . . . Exhibiting such an admission to the tribunal is not to produce proof. It is not even to prove a prima facie case. It is final, conclusive, irrebuttable by evidence. It is a fact to which procedure assigns a definite value. It is in no sense evidence of a fact, amenable to the rules of logic." 2 Chamberlayne, Ev. Sec. 1238.

I shall not refer in detail to the authorities cited in the opinion on this question. It is sufficient to call attention to the fact that some of those to which apparently the most weight is attached, in no manner sustain the points to which they are cited. The quotations which I have made from Chamberlayne are contained in the long chapter cited in bulk in the majority opinion, and show the distinction between judicial admissions and extrajudicial admissions; and a further inspection of that chapter and the statements in the majority opinion, I think, disclose a misapplication of the law relating to extrajudicial admissions to this case. The definition of judicial admissions is applicable herein and to the affidavits under consideration. They were made in this case, filed in this case, and used in this case, and are therefore judicial admissions, the effect of which is defined in the quotation I have used. The further quotation contained in the majority opinion, from § 898 of Wigmore on Evidence, relates to admissions made in one case and sought to be used in subsequent litigation,—that is, in another case.

Finally, I may say that I am impelled to my conclusion by the obvious effect, if not purpose, of acceding to defendant's demands. This effect is to grant a new trial, which cannot legally afford the defendant relief in this action; and as to all questions, except the law as to the president of a bank being a due course purchaser, it simply amounts to giving the defendant an opportunity to produce evidence which he might, with the slightest effort, have produced at the former trial, and which he will now be enabled to obtain by this indirect method of applying for a new trial, and on grounds on which a new trial is never granted, even when application is made to the trial court.

In my opinion the appeal should be dismissed.

BRUCE, J. I concur in the above opinion.