(122 So. 362)

SNELL NAT. BANK OF WINTER HAVEN
v. JANNEY. (3 Div. 883.)

Supreme Court of Alabama. April 11, 1929.

Rehearing Denied May 23, 1929.

Walton H. Hill and Hill, Hill, Whiting, Thomas & Rives, all of Montgomery, for appellant.

Steiner, Crum & Weil and Ball & Ball, all of Montgomery, for appellee.

GARDNER, J. In November, 1925, during the period of the real estate boom in Florida, the defendant in this action bought a dwelling lot located about five miles from Winter Haven, the estimated population of which varies, according to the proof in this record, from 3,000 to 8,000, and agreed to pay therefor $3,500. There has been paid in cash something over $1,200, and deed duly executed; the balance of the purchase price being secured by promissory notes, negotiable in form. The note here sued upon, in the sum of $778, bears the following notation upon its face: "Lot No. 713 E. W. East Lake Mariam Unit"— and there is no insistence that this memoranda affected its negotiability. Ex parte Abraham (Wible v. Abraham (Ala. Sup.) 120 So. 474;[1] Culbreath v. Guiterman, Rosenfield & Co., 217 Ala. 259, 115 So. 303; Strand Amus. Co. v. Fox, 205 Ala. 183, 87 So. 332, 14 A. L. R. 1121.

The notation had reference to the lot located in the subdivision known as Eloise Woods, formerly an orange grove consisting of some 800 or 900 acres. The promotion and disposition of this property seems to have been by two corporations, the Hundred Lakes Corporation and the Haven Villa Corporation, but they occupied the same office and their relation was so close that, so far as this case is concerned, they may be treated as one. One Snively was secretary of these two corporations and one Bruce signed as president of the Hundred Lakes Corporation. It was through the representatives of this latter corporation the sale to defendant was made, and the deed executed. The property was advertised as a $20,000,000 development, and the salesman made many representations to defendant as to valuable improvements which were soon to be installed: The pavement of all streets, water mains laid, electric lights, and gas, and the erection and maintenance of public parks. These were not mere expressions of expectation and purposes of the company, as illustrated in Joseph v. Decatur Land Co., 102 Ala. 346, 14 So. 739, but were actual promises and engagements and, indeed, the greater portion of which constitute covenants in the deed, as appears in the ninth paragraph thereof. Defendant's evidence tended to show none of the promised improvements had been made in the vicinity of his lot, and that "the streets were grown up in weeds and grass."

While there is some evidence tending to show hard-surface streets in a portion of the subdivision, though to what extent is not made to appear, it is clear there were no improvements in the direction of defendant's property, and we think from the evidence the jury could infer that whatever of improvements were made in the subdivision was more by way of a gesture to further stimulate interest rather than an effort in good faith to meet the promises and obligations outstanding. That these promises of improvements constituted the major portion of the value of the lots and induced defendant and others to purchase clearly appears without conflict, and with equal certainty it is established that no improvements whatever have appeared in the vicinity of defendant's lot. We enter into no detailed discussion of the evidence. Suffice it to say that from its careful consideration in consultation we conclude a jury question was presented as to whether or not the representations as to future improvements were made in good faith or were fraudulently made with no

_____
[1] 218 Ala. 664.

398

intention at the time of fulfilment, but as a part of a scheme to induce purchasers and dispose of the property at a large profit, far in excess of its actual value. 12 R. C. L. 432; Braddy v. Elliott, 146 N. C. 578, 60 S. E. 507, 16 L. R. A. (N. S.) 1121, 125 Am. St. Rep. 523; Chicago, Texas, etc., R. Co. v. Titterington, 84 Tex. 218, 19 S. W. 472, Am. St. Rep. 31, 39; note 27 A. L. R. 346.

It is well established in this jurisdiction that while a failure to fulfil a mere promise or undertaking—something to be done in the future—alone will not authorize a rescission on the ground of fraud, yet if the promise is made with no intention at the time to perform it, that constitutes fraud justifying a rescission. Nelson v. Shelby Mfg. Co., 96 Ala. 515, 11 So. 695, 38 Am. St. Rep. 116; St. L. & S. F. R. R. Co. v. McCrory, 2 Ala. App. 531, 56 So. 822; So. Loan & Trust Co. v. Gissendaner, 4 Ala. App. 523, 58 So. 737.

There was evidence tending to show that without these improvements defendant had paid far in excess of the lot's value. As between the original parties to this transaction, therefore, the jury was authorized from the evidence upon this issue to find for the defendant. But the suit is by the Snell National Bank of Winter Haven claiming as a bona fide purchaser of the note before maturity, without notice of any such defensive matter, and it is earnestly insisted that upon any matter affecting its right as such purchaser a jury question was not presented, and that the trial court erred in refusing the affirmative charge requested in its favor. The fact that the note was required as collateral security for past-due indebtedness, and that plaintiff had knowledge that it was founded on an executory contract, does not alter plaintiff's status as a holder in due course. Reliance Equipment Co. v. Sherman, 216 Ala. 214, 112 So. 822; Ex parte Abraham, supra.

By the same authorities it is established, in keeping with the statute (section 9082, Code), that to constitute notice of an infirmity the indorsee must have knowledge of such facts that his action in taking the instrument amounted to bad faith. "Bad faith in the purchase, or such gross negligence as is evidence of bad faith must be shown." Wildsmith v. Tracy, 80 Ala. 258.

The question of good faith is, therefore, the pivotal point in the case, and its solution turns upon the question of notice, a discussion of which necessitates a brief review of the evidence pertaining thereto.

Snively was a man of means, a resident of Winter Haven, and a long number of years one of the directors of the plaintiff bank. The bank had loaned to him and his associates "considerable money" and never "seriously thought about securing his indorsements." The bank examiner in January, 1926, criticized the loan and suggested security. The matter was reported to Snively by the bank cashier, and in compliance with such request

Snively indorsed to the bank a note of the Hundred Lakes Corporation, dated May 1, 1926, payable to himself in the sum of $180,000, delivering at the same time notes by various persons, payable to the Hundred Lakes Corporation, as collateral security therefor. These notes aggregated $360,000, and among them was the note of this defendant. The note of the Hundred Lakes Corporation was signed by Bruce, as president, who was also a vice president (though inactive) and a director of plaintiff bank. The office of the Hundred Lakes Corporation was in Winter Haven, two blocks from the bank. The cashier went to the office and went over these notes with the bookkeeper. His testimony discloses he knew defendant's note was given as part payment of the purchase of a lot in the subdivision hereinbefore designated. Snively had informed the cashier that the Hundred Lakes Corporation owed him $400,000 for land and the cashier knew also that Snively was promoting other subdivisions.

Mr. Anderson, the bank cashier, testified for plaintiff, and states that he knew nothing of the promises made as to future development of the property, but he admits much familiarity with the high-pressure sales method, and highly colored advertisements of the several real estate concerns promoting the sale of property in the vicinity of Winter Haven. The Hundred Lakes Corporation was a customer of the bank. There were two newspapers published in Winter Haven, and the officers of the bank were subscribers. He states that the Hundred Lakes Corporation had a number of advertisements appearing in those papers. He saw many of them, but states he does not know whether any of them carried any promises as to future development. Some of these advertisements were offered in evidence, and in connection with glowing accounts of the subdivision there appeared the clause: "Do you appreciate the guaranteeing of such improvements as electricity, water, streets and park beautification, as a money making proposition?" Anderson himself did not buy, and then adds, "They were selling outside people." Anderson had been cashier of the bank several years and had known Snively 12 or 14 years.

The relations between Snively and the bank were evidently rather close. Snively was and had been for several years a director and Bruce, president of the Hundred Lakes Corporation, who signed the note to Snively for the company for $180,000 and indorsed the $360,000 collateral notes to secure the same for Snively, was an inactive vice president of the bank and a member of its board of directors. Ambrose, also connected with the Hundred Lakes Corporation, was likewise a director of the bank. The relationship of these bank directors with the Lakes Corporation is matter properly to be considered by the jury (8 C. J. 524; McCarty v. Kepreta, 24 N. D. 395, 139 N. W. 992, 48 L. R. A. [N. S.] 65,.

Ann. Cas. 1915A, 834), for, though Snively was acting in his own interest, this does not so appear as to Bruce and Ambrose as to this transaction. But in any event the close relationship in a business way, evidently followed by much personal contact, is to be given due consideration. Anderson's testimony is reasonably to be construed as showing his knowledge of development of this subdivision as well as others in and around Winter Haven, and some of the methods used to procure purchasers.

We are persuaded from all the evidence the jury could infer that the cashier of this bank knew of the promises to purchasers of future development, and upon which they relied, and that very probably such promises would not, and on account of the great expense involved doubtless could not, be fulfilled. To make use of the language of this court in the Reliance Equipment Co. Case, supra, we think the jury could infer from the proof that the bank had "notice of facts which should arouse suspicion in the mind of one of ordinary business prudence that the consideration has failed, or is so likely to fail that [it] becomes a participant in [the] fraud." Upon this question of good faith, therefore, we are of the opinion a jury question was presented and the affirmative charge properly refused.

Other assignments of error need but brief consideration. The matters of evidence complained of were either admissible in the wide range of inquiry on the question of fraud or upon that of notice to the bank. The cashier admitted reading circulars and newspaper advertisements and they were admissible. Wildsmith v. Tracy, supra.

The trial court correctly charged the jury upon the issues presented as above outlined.

The case was fairly presented to the tr'ers of fact and under the well-known rule of Cobb v. Malone, 92 Ala. 630, 9 So. 738, we find no occasion to disturb the action of the court in denying the motion for a new trial.

No reversible error appearing, the judgment will be affirmed.

Affirmed.

ANDERSON, C. J., and BOULDIN and FOSTER, JJ., concur.

